WALLACE et al. v. WALLACE et al.

(Supreme Court, Special Term, Westchester County. October, 1911.)

1. Evidence (§ 278\*)—Declarations Against Interest.

In an action to have the residuary devisee and executor under a will declared a trustee to execute the terms of a contract for the execution of mutual wills by the testatrix and her husband, declarations by such testatrix tending to show the existence of such a contract were competent as admissions against interest against the personal representative and beneficiaries.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1137, 1138; Dec. Dig. § 278.\*]

2. Evidence (§ 220\*)—Declarations Against Interest.

And statements of the husband, made in the presence of and without objection from such testatrix, were also admissible to show such matters.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 771–785; Dec. Dig. § 220.\*]

3. Witnesses (§ 202\*)—Privileged Communications—Communications to Attorney.

Under Code Civ. Proc. § 835, which provides that an attorney shall not be allowed to disclose communications made by his client to him in the course of his professional employment, in an action to have the terms of a contract between a husband and wife to make mutual wills enforced against the executor of the wife's estate, a clerk and a stenographer, who were in the office of the lawyers claimed to have drawn such wills at the time of their alleged execution, were not competent to testify as to such matters, or to establish a writing as a copy of the will in question.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 756, 757; Dec. Dig. § 202.\*]

4. Witnesses (§ 255\*)—Privileged Communications—Communications to Attorney.

While, under Code Civ. Proc. § 836, which provides that an attorney shall not be disqualified to testify as to the preparation and execution of a will, where he is one of the subscribing witnesses thereto, a former clerk in the law office in which a will was prepared was competent to testify as to its execution, where he was a subscribing witness, his testimony was incompetent, where based upon a refreshing of his memory by the establishment of a copy of the will by testimony incompetent under section 835.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 874–890; Dec. Dig. § 255.\*]

5. Witnesses (§ 219\*)—Privileged Communications—Waiver—Right of Personal Representative to Waive.

Code Civ. Proc. § 836, provides that the personal representative of a testatrix may waive the professional privilege of a medical witness,

but makes no provision as to such a waiver of a witness disqualified as the attorney of a testator under section 835. *Held*, that a waiver of the right of such representative to object to such witness, or to the admission of letters written to attorneys, cannot be predicated on a failure to object to the admission of such testimony in a related action.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 769, 781, 782; Dec. Dig. § 219.*]

6. WILLS (§ 58*)—CONTRACT TO DEVISE—EVIDENCE.

In an action to have the residuary devisee and executor under a will declared a trustee to execute the terms of a contract for mutual wills by the testatrix and her husband, evidence *held* insufficient to sustain a finding of the execution of such contract and wills.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 164, 165; Dec. Dig. § 58.*]

7. WILLS (§ 58*)—CONTRACTS TO DEVISE—ESTABLISHMENT.

A contract binding one to devise his property must be established by an instrument in writing, or, if based on parol, the contract must be established by the clearest and most convincing evidence of disinterested witnesses and in certain and definite terms.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 164, 165; Dec. Dig. § 58.*]

8. WILLS (§ 58*)—INTEREST—EVIDENCE.

In an action to establish a contract to devise, evidence *held* to show that certain witnesses were not disinterested.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 164, 165; Dec. Dig. § 58.*]

9. WILLS (§ 58*)—CONTRACTS TO DEVISE—EVIDENCE.

Testimony of verbal admissions of a testator is of slight probative force in establishing a contract to devise.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 164, 165; Dec. Dig. § 58.*]

10. WILLS (§ 78*)—RIGHT TO REVOKE—AMBULATORY NATURE.

A will is by its nature ambulatory and subject to change, so that a statement of a testator that his will is final will not import an agreement that it cannot thereafter be changed.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 198; Dec. Dig. § 78.*]

11. COURTS (§ 90*)—ADJUDICATION—EFFECT—FACTS.

A decision of another judge as to the effect of a set of facts is not decisive or conclusive in a subsequent proceeding.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 313–321, 351; Dec. Dig. § 90.*]

Action by Jessie Wallace and others against Howard Gurdon Wallace and others. Judgment for defendants.

John H. Jackson, of New York City (Edward W. Hatch and Ambrose F. McCabe, of counsel), for plaintiffs.

Clifford Couch, of Peekskill (Franklin Couch, of counsel), for defendant Howard G. Wallace.

Smith Lent, of New York City, for defendant Ruddy.

MILLS, J. Juliet Wallace died September 29, 1909, in the borough of Brooklyn, leaving her last will and testament, which was dated and had been executed on the 2d day of May, 1902. Such will was duly

probated by the Surrogate's Court of Kings county, November 22, 1909, and letters testamentary thereon were, by that court, then duly issued to the defendant Howard Gurdon Wallace, who thereupon qualified and is still acting as such executor. Juliet Wallace left an estate aggregating about $800,000, nearly all of which she had received from her husband, James P. Wallace, who had predeceased her January 18, 1897, leaving a last will and testament, executed May 18, 1894, by which he left his estate to his widow, the said Juliet Wallace. The plaintiffs and the said defendant Howard Gurdon Wallace are the surviving children of Gurdon B. Wallace, who was a brother of Juliet Wallace.

The said will of Juliet Wallace gave a legacy of $25,000 to each of the plaintiffs, and, after giving certain other legacies, including one to the defendant Howard Gurdon Wallace of $75,000, gave the great bulk of her estate, or at least a half thereof, amounting to approximately $400,000, in a residuary legacy and devise to the said Howard. This action has been brought in equity to secure a decree of this court to the effect that the said Howard, as such executor, holds the property left by the said Juliet in trust for the purpose of carrying out a contract, which the complaint alleges the said Juliet and the said James P., on or about May 18, 1894, entered into, whereby they mutually agreed to make and then made their mutual wills, by which each gave to the other his or her entire estate, if the other survived, and, if not, then one half thereof to the blood relatives of the said Juliet, and the other half to the blood relatives of the said James P., each half to be distributed in certain stated proportions, and by which they mutually agreed each to maintain his or her said will, which was actually executed on that day, until his or her death, and, further, that the estate of the said Juliet must be distributed according to the terms of her said will made May 18, 1894. It appears that, by the terms of the said last-mentioned alleged will, each of the plaintiffs would receive, out of the said estate, about $75,000; whereas, by the terms of the will of said Juliet of May 2, 1902, each plaintiff will receive only the sum of $25,000.

During the trial certain questions of evidence arose, as to which my mind was not clear; and, by consent of counsel, it was stipulated that those questions should be discussed in their briefs to be submitted, and that the court, in determining the case, should decide, first, of course, those questions of evidence, striking out so much of the evidence received, over objection, as the court might then finally determine to be inadmissible. It is now, therefore, my duty first to determine such reserved questions of evidence. Such evidence, so received, was of three distinct classes, viz.: (1) Declarations of James P. Wallace, tending to show the existence of such contract; (2) declarations of Juliet Wallace of similar character; and (3) testimony of two clerks and a stenographer of the attorneys of Juliet, tending to show that she executed a will on May 18, 1894, at the same time and place that James P. executed his will, and that a certain purported copy, produced from the files of such attorneys, is a copy of her such will. After examining the briefs submitted by the learned counsel upon this

topic, and the authorities therein cited, and reflecting upon the matter, I conclude that the said first and second classes of evidence were admissible, and that said third class was incompetent and inadmissible.

[1] As to the second class, namely, the declarations of Juliet tending to show or acknowledge the existence of the trust contract alleged, it seems clear to me that they are competent evidence. They were her admissions against interest, tending to establish the obligation here charged against her, and are competent proof against her personal representative and those who take under her will. Hurlburt v. Hurlburt, 128 N. Y. 420, 28 N. E. 651, 26 Am. St. Rep. 482.

[2] The declarations of James P. were admitted only so far as they appear to have been made in the presence of Juliet and with her acquiescence, express or implied. His statement in the immediate presence and hearing of his wife, as testified to by Miss Whitcomb, was of such a character that she would naturally have spoken if she had not recognized such statement to be correct; and therefore, upon elementary doctrine, her failure to speak may, of itself, be taken as her acquiescence in the statement, and therefore the statement be accepted as though made by her.

[3] As to the third class of reserved evidence, as the record now stands, by the testimony of a former clerk (Flynn) of the law firm of Butler, Stillman & Hubbard, who in 1904 and up to her death, or at least until 1902, when her will was made, were the attorneys of Juliet, and by the testimony of Devlin, a lawyer then in the employ of that firm, and now in the employ of the law firm of Wallace, Butler & Brown, the successors of the first-named law firm, and by the testimony of Leddy, then the stenographer of Butler, Stillman & Hubbard, plaintiffs have been enabled to prove that on May 18, 1894, Juliet Wallace executed a will, of which Exhibit B, attached to the complaint, is a copy, at the same time and place and with the same witnesses that her husband executed his will. The said firm of Butler, Stillman & Hubbard were the attorneys of both James P. and Juliet. The late John Notman, of that firm, in the main attended to their legal business.

The witness Devlin testified that recently, at least since the death of Juliet, September 29, 1909, he had examined the files of papers in the office of Wallace, Butler & Brown, and there found among them what purported to be a typewritten copy of a will made by Juliet Wallace, May 18, 1894, and that he had produced such copy before the surrogate of Kings county at the probate of her 1902 will, and later had seen the same copy, at a trial in this court before Mr. Justice Blanchard, in New York county, of another similar action. It was admitted here that the said Exhibit B is a correct copy of such copy so produced before said justice. The witness Baird testified that he was the attorney of the plaintiffs in such other action, which was brought by certain blood relatives of James P. Wallace, and that, as such, he received from said Wallace, Butler & Brown the said purported copy of a will of Juliet Wallace, made May 18, 1894, and that, after the trial of that action, he had mislaid such copy and could not now find it.

Before Devlin testified, and identified the copy, and stated where it

was found, Flynn was examined as a witness for the plaintiffs, and testified that, without having his recollection refreshed by something, he could not say whether or not he was a subscribing witness to any other will, namely, one by Juliet made at the time when James P. Wallace made his will, to which it was established he was one of the subscribing witnesses. Counsel for the plaintiffs, in withdrawing Flynn as a witness at that point in his testimony, said:

"I will have to ask this witness to step aside and call a witness for the purpose of refreshing Mr. Flynn's recollection."

After Devlin had testified as above, establishing the source of the typewritten copy, Flynn was recalled and handed Exhibit D, which was admitted to be a correct copy of the copy so established, which had been produced before Mr. Justice Blanchard, and testified, in effect, that his recollection was by such copy so refreshed that he could say and did say that he did act as a subscribing witness upon that occasion to the execution of a will by Juliet, of which that Exhibit D was a copy (such exhibit being exactly like Exhibit B attached to the complaint), such copy purporting to show his name as that of a subscribing witness.

Leddy, the stenographer, testified also that, as a stenographer of Butler, Stillman & Hubbard, and especially of Mr. Notman, he made the said typewritten copy from the original, and that he then recognized the handwriting of the subscribing witnesses, who were clerks in the office of those attorneys, and that he usually did such work at the personal direction of Mr. Notman. After all the above testimony, Flynn was recalled for the plaintiffs, and, with Exhibit D before him, testified positively to the usual facts, to which a subscribing witness testifies, as to the execution of the alleged will of Juliet Wallace made May 18, 1894.

From the above, it is manifest that the entire testimony of Flynn rests upon the authenticity of such typewritten copy, or at least upon the proven source of that copy, and that such source, was proven by the testimony of Devlin, the lawyer or clerk, and Leddy, the stenographer, of the attorneys of Juliet at that time. It appears that these witnesses, Leddy, Flynn, and Devlin, gave like testimony before Mr. Justice Blanchard at the trial of the other action, without objection on the part of the defendant Howard G. Wallace, who was the leading defendant in that action as well as he is in this.

[4] The recent case of Matter of Cunnion, 201 N. Y. 123, 94 N. E. 648, Ann. Cas. 1912A, 834, in effect decides that, aside from any question of waiver, the testimony of the lawyer or clerk, Devlin, and of the stenographer, Leddy, is entirely incompetent, as prohibited by section 835 of the Code of Civil Procedure. Under section 836 of that Code, Flynn, having been one of the subscribing witnesses, was competent. As to him, Juliet Wallace may be deemed to have waived the prohibition of section 835. But, as the main and vital part of his testimony was based upon the forbidden evidence as to the typewritten copy and its source and his examination of the same in open court, it would seem clear that at least that part of his testimony is equally incompetent. It was expressly held in the Cunnion Case, 135

App. Div. 864, 868, 120 N. Y. Supp. 266, that the prohibition of section 835 extended to putting in evidence the copy of the will, which copy the attorney had retained.

[5] It is, however, contended by the learned counsel for the plaintiffs that the defendant Howard must be held to have waived the prohibition of said section 835 as to these witnesses, Flynn, Leddy, and Devlin, by the fact that at the trial of the other action in this court, at the New York Special Term in December, 1910, he permitted the plaintiffs in that action to introduce their similar testimony without objection upon his part. This is claimed by analogy to the decision in McKinney v. G. S. P. P. & F. R. R. Co., 104 N. Y. 352, 10 N. E. 544, where it was held that in a personal injury action the plaintiff, by examining her physician as a witness in her behalf at a former trial, waived her privilege as to him for all time, so that the defendant could examine him as a witness in its behalf at a subsequent trial. Indeed, the Appellate Division in this department has held that the plaintiff in such an action, by failing at one trial to object to the examination of his physician by the defendant as one of its witnesses, waived the right to object at the trial of another like action to the examination by the defendant of the same physician as a witness in its behalf. Schlotterer v. B. & N. Y. F. Co. (Second Dept.) 89 App. Div. 508, 85 N. Y. Supp. 847.

The difficulty in applying these decisions to the case here is that the defendant Howard, as executor, is not by section 836 authorized to waive the privilege of his testatrix, Juliet Wallace, under section 835, as to these witnesses. In those decisions the party who suffered the physician to be examined at the prior trial was the patient himself. He was competent to waive. Here the client, Juliet Wallace, is dead; and I cannot perceive that section 836 authorizes any one to waive such prohibition. As to a physician, that section authorizes the personal representatives of the deceased patient to waive; but it confers no such authority as to an attorney, and I cannot perceive how, by failure to object, a person not authorized to waive can be held to have waived—in other words, how such a person, by the acquiescence of silence, can be held to have done what he was powerless to do by express action or direction. Therefore I hold and decide that the objections taken by the defendants to the third class of reserved evidence are good, and must be sustained, and such evidence stricken out.

The same reasoning requires the exclusion of the letter of Juliet Wallace to her attorney, William Allen Butler, dated January 30, 1897, and also the memorandum signed by her and marked as Plaintiff's Exhibit No. 7. Indeed, as to those papers there is no proof or admission that they were received in evidence at the trial before Mr. Justice Blanchard.

If it were affirmatively established that the directions for drawing the two wills, alleged to have been executed on May 18, 1894, and the opportunity to make the typewritten copy produced, were given by the joint action of Mr. and Mrs. Wallace, it might be held that their incidental communications with their common attorney would not be within the protection of section 835, under the doctrine of Hurlburt

v. Hurlburt, 128 N. Y. 420, 28 N. E. 651, 26 Am. St. Rep. 482; but there is no evidence of that sort in the case before me, nor do I think that such situation could be inferred from the mere fact, if it were proven, that the two wills were simultaneously executed.

[6] With the record thus corrected, I do not perceive that there is any evidence that Juliet Wallace, on May 18, 1894, or at any other time, made a will of which exhibit B, attached to the complaint, is a copy. The entries in the books of the Trust Company indicate that a paper was deposited there May 26, 1894, by her husband, as her will, and that, after it had been removed and returned with a paper designated as a codicil, which was deposited with it in 1899, both papers were finally removed by her or by her direction. These entries and her receipt may indicate that she recognized as her will the paper deposited by her husband as such. I find in the corrected record no other evidence that she made any will prior to that of 1902, except such evidence as has been given by Dr. Hoyt and Miss Whitcomb, witnesses for the plaintiffs. The problem before me to decide, therefore, is this: Is the testimony given by those two witnesses sufficient to sustain this action?

The attempt of the plaintiffs here, by such testimony, is to establish that James P. Wallace made and maintained his will, giving all his estate to his wife, upon her making a will giving her estate to him if he survived her, and, if not, then one half thereof to his blood relatives, and the other half to her blood relatives in certain proportions, and upon her engagement, in consideration of his making and maintaining his such will, to maintain hers unaltered to the end; she having survived him and received his estate, and not having maintained her such will.

Of late years there have been, in the Court of Appeals, a series of cases which have very clearly and positively declared the rules which must govern in determining such a claim, namely, a claim that a decedent made a given contract to dispose of his or her estate at death in a different manner than he or she attempted to do. Taylor v. Higgs, 202 N. Y. 65, 95 N. E. 30; Miller v. Hill, 137 App. Div. 378, 121 N. Y. Supp. 741; Id., 203 N. Y. 646, 97 N. E. 1109; Tousey v. Hastings, 194 N. Y. 79, 86 N. E. 831; Holt v. Tuite, 188 N. Y. 17, 80 N. E. 364; Roberge v. Bonner, 185 N. Y. 265, 77 N. E. 1023; Rosseau v. Rouss, 180 N. Y. 116, 72 N. E. 916; Ide v. Brown, 178 N. Y. 26, 70 N. E. 101; Hamlin v. Stevens, 177 N. Y. 39, 69 N. E. 118; Edson v. Parsons, 155 N. Y. 555, 50 N. E. 265.

[7] Those rules, or the leading ones, may be summarized as follows, viz.: (1) Such a contract must be in writing and the writing produced, or, if ever based upon parol evidence alone, it must be given or corroborated in all essential particulars by disinterested witnesses. 180 N. Y. 121, 72 N. E. 916. (2) Such testimony must be of the clearest and most convincing character. 180 N. Y. 121, 72 N. E. 916. (3) Verbal admissions of the decedent in any event, and especially when uncorroborated by other facts or evidence, should always be weighed with very great caution, and such admissions, made in the course of casual conversation, when testified to after a great

lapse of time, should be given little probative force. 180 N. Y. 121, 72 N. E. 916. (4) The testimony of such a witness should be free from circumstances making it appear like an afterthought. 194 N. Y. 81, 86 N. E. 831. (5) The evidence must establish the alleged contract in certain and definite terms. 202 N. Y. 70, 95 N. E. 30. (6) The admissions should be recalled and expressed by the witness in substantially the exact language of the decedent, and not merely according to the witness' understanding. 127 App. Div. 97, 111 N. Y. Supp. 344, and 194 N. Y. 81, 86 N. E. 831. And (7) the alleged contract, or what it would accomplish, should seem to be equitable. 177 N. Y. 48, 69 N. E. 118.

These rigid rules are very clearly and emphatically asserted in the several recent cases from which the substance of the requirements have just above been excerpted. Judged by these tests, it seems to me that the evidence here falls far short of establishing the plaintiffs' case. I have reached this conclusion for the following reasons:

First. No written evidence of the alleged contract, or written acknowledgment by the testatrix of its existence, is produced; and it is evident that a rigid search among her effects has disclosed none such. Considering the business character and experience of James P. Wallace, and the constant aid which the parties had from the late and eminent lawyer, Mr. Notman, the absence of such written proof seems of especial force. It appears quite improbable that such people would have left such an engagement of great importance without written evidence thereof. Indeed, it appears quite extraordinary that, if such end were desired by James P., he would not have secured it by the apt and usual way of leaving a life estate to his wife, which would have been more than ample for her support, with remainder over according to his alleged wishes.

Some adverse comment is made by plaintiffs' counsel upon the fact that the defendant Howard, shortly after his aunt's death, destroyed certain of her papers; and the intimation is made that he may then have destroyed such written contract or evidence. There does not appear to me to be any likelihood that any such writing was then in her safe. If any such had been in her possession, it was likely destroyed when the will of 1902 was made, as all parties concerned must in that transaction have then realized that it constituted a breach of that contract.

Second. Taking the testimony of Dr. Hoyt and Miss Whitcomb in the light most favorable to the plaintiffs, it is without proof of a copy of the will actually made by Juliet on or about May 18, 1894, if she made any such; and therefore such testimony is too indefinite and uncertain as to the terms of the contract to serve the case of these plaintiffs. At the most, such testimony amounts to evidence that Mr. and Mrs. Wallace had made their mutual wills and were to maintain them so as in the end to divide the entire property of both equally between their two families, viz., one half thereof to the blood relatives of James, and the other half thereof to those of Juliet. This, however, would not make the plaintiffs' case, which requires that the contract called upon Juliet to distribute the one-half coming to her blood

relatives in a certain proportion, and therefore forbade her giving to her nephew, the defendant Howard, who had lived with her and served her the latter years of her life, more than to either of his sisters, these plaintiffs.

[8] Third. Neither of these two witnesses now appears to be disinterested. Dr. Hoyt testified that the plaintiffs in such other action, and soon after the same had resulted in a compromise (terms of which are not explained by the proofs here), sent him checks aggregating $7,500 as a gratuity for his testimony. While he insists that he had not been promised anything of the sort, he nevertheless admits that he felt disappointed, when he received those checks, because they were not for a larger amount. Moreover, it appears that before he would, for this trial, come within the jurisdiction of this court from his home in Florida, he exacted from these plaintiffs here the purchase of his $5,000 legacy under the 1902 will of Juliet Wallace, by requiring a deposit of the amount thereof, with interest, *in escrow*, to be paid over to him as soon as this case may have been decided. His sense of equity seems quite extraordinary, for he claims to consider it proper for him to be secured against loss of his legacy under the 1902 will as the result, in whole or in part, of his testimony given at this trial, when, if his own evident view of the effect of such testimony be correct, that legacy, as well as the residuary legacy to the defendant Howard, was a breach of the contract made by Mr. and Mrs. Wallace and the trust upon which she received from her husband his estate.

Miss Whitcomb, too, after the trial of the other action, received from the plaintiffs therein, for whom she had testified at such trial, a gratuity of $1,000, although she also here insists that she had no expectation of receiving any compensation or gratuity whatever for or in consideration of her having so testified. It is quite natural to conclude that, whatever may have then been true, she now may indulge some expectation of a similar result in this case, if the plaintiffs here succeed. Indeed, she admits that, some few months before the present trial, she informed the attorney of these plaintiffs that she had received such gratuity from the plaintiffs in the other action.

Moreover, each of those two witnesses evidently has some sense of grievance. Dr. Hoyt expected that James P. Wallace would leave him a legacy; and to his disappointment, doubtless, after the death of James, Juliet ceased sending him the allowance of $25 a month which, for many years prior to his death, James had made to him. Miss Whitcomb had expected that Juliet would leave her a legacy, and was disappointed that she did not do so in the will of 1902; and yet it is quite difficult to understand with what sense of equity she indulged that expectation, if, as she would now have the court believe, Juliet Wallace was bound to dispose of the entire estate, as her husband had directed, by the alternative disposition in his will.

Fourth. Each of those two witnesses testified to mere verbal statements of the testatrix, made long ago, neither claiming to have been present at the actual making of any agreement between Mr. and Mrs. Wallace, or the making of the alleged mutual wills; Dr. Hoyt to

statements made about 17 years before the trial of the other action, and Miss Whitcomb to one made at that time, and another some 13 years before that trial. There is no intimation that either witness made any memorandum of either alleged conversation, or in any way discussed the same, until a few months before such other trial.

Fifth. While, as explained by him, the interest of Dr. Hoyt in the alleged conversation is manifest, and therefore the same is not to be considered unnatural as to him, yet it seems extraordinary that Mr. and Mrs. Wallace should have had any such talk with Miss Whitcomb, and that she should have had any particular interest therein.

[9] Sixth. It appears that each of those two witnesses, before testifying, received from the party for whom he or she testified, or their attorney, certain suggestions, in writing even, as to the character of such testimony. By such means he was led to recall the significant word "mutual," and she was led to take the stand on the second day and recast her testimony, so as to bring in and emphasize the finality of what Mrs. Wallace said. A comparison of her two testimonies indicates clearly the importance of the change. Her testimony, given on the first day at the other trial, was certainly consistent with a mere intent on the part of Mrs. Wallace not to change her will; while that given by her on the second day, under the suggestion of the plaintiffs' attorney to make her testimony more emphatic, inserted the important words "because it had been made according to the arrangement with Mr. Wallace at the same time." As held in the Tousey Case, supra, 127 App. Div. 97, 111 N. Y. Supp. 344, and 194 N. Y. 81, 86 N. E. 831, words of the former character would have little probative force in an action of this sort.

Seventh. As to Miss Whitcomb, in the end she admitted that she could not be certain of the exact language used by Mrs. Wallace, but that she, the witness, merely gave her understanding of it. In a case like this, where a slight verbal change may be most significant, testimony of that character is of little force, as also was held in the Tousey Case, 127 App. Div. 97, 111 N. Y. Supp. 344; 194 N. Y. 81, 86 N. E. 831. Under such circumstances, it is difficult for the trial court to be satisfied in regard to such testimony as to "how much is inference and how much recollection."

[10] Eighth. The testimony of Dr. Hoyt is entirely consistent with the idea that Mr. and Mrs. Wallace merely expressed their then present intention that the wills, which they had just made or were about to make, should be final. That idea is far from the thought that they had mutually agreed that the survivor should, under no circumstances, change his or her will after the other's death. I do not perceive how what Dr. Hoyt's testimony makes Juliet say, or have said, amounts to anything more than what would appear upon the face of the two wills, if the same were produced or authentic copies of them proven. A will no doubt in a sense is, for the time being, intended by the maker thereof as a final disposition; but by its nature it is ambulatory—that is, subject to change. The statement, "These wills are final," does not of itself import any agreement that they may not here-

after be changed; and Dr. Hoyt's testimony, if fully credited, amounts to no more than that.

Ninth. Dr. Hoyt's letter to Mary Wallace, written December 7, 1909, does not to my mind indicate that he then believed that Mr. and Mrs. Wallace had declared anything to him, other than their then present intention of dividing the estate equally between the two families. He therein urges "Christian arbitration and settlement out of court" upon that basis, not that he understood that there was any binding agreement between Mr. and Mrs. Wallace to that effect.

Apart from the considerations above stated affecting the testimony of those two witnesses, some other matters appear worthy of note. The late Mr. John Notman was an eminent lawyer and a man of high character. He was the personal counsel of both Mr. and Mrs. Wallace. He drew his will and also hers of May 2, 1902, and, if she made one of May 18, 1894, when her husband made his, he doubtless drew that also, and he attended to the execution of all the wills. If there was, between those parties, any agreement such as these plaintiffs here claim, he must have known of it. It is difficult to believe that, in such case, he would have been a party to the making of the will of 1902, which he must have known was a violation of such agreement and a breach of the trust thereby created.

Moreover, all concede that Mrs. Wallace was a woman of the highest character, who greatly respected her husband, and was in the full possession of her faculties when she made the will of 1902. It is again difficult to believe that such a woman would have perpetrated such a fraud as, in the view here presented by these plaintiffs, her will of 1902 was. It is true that the alleged contract accords with the natural equity that the estate should ultimately be divided equally between the two families, as all the descendants of the parties (Mr. and Mrs. Wallace) had died, and they were so advanced in years that, of course, they were without hope of further issue; but it is not clear that any natural equity would have been promoted by depriving Mrs. Wallace of her natural right to distribute her half of such estate among her blood relatives, according to her judgment of their respective deserts.

[11] The learned counsel for the plaintiffs contends that this court should regard the decision of Mr. Justice Blanchard, reported at 71 Misc. Rep. 305, 130 N. Y. Supp. 58, upon the trial of the other action, in favor of the plaintiffs therein, who were blood relatives of James P. Wallace, as decisive and conclusive here in favor of these plaintiffs. It seems to me that the decisive questions in both actions were of fact, and not of law, and I do not understand that one judge should govern his judgment of facts by that of any other judge.

It seems to me, moreover, that the case here before me is far different from that which was before Mr. Justice Blanchard at the trial of the other action. He had before him the testimony of the three witnesses, Devlin, Flynn, and Leddy, and the alleged typewritten copy of the alleged will of May 18, 1894, all of which have been now excluded from this case. He did not have before him at all the facts, present here, that the two leading witnesses of the plaintiffs had re-

ceived, after giving similar testimony for other plaintiffs in a like case, large sums of money, and that at least one of those witnesses was sorely disappointed that he had not received from them a larger sum for having so testified, or the other fact, here proven, that before testifying such witness had exacted a purchase by such plaintiffs of his imperiled legacy at its face value, and the actual deposit in escrow of the purchase price—a legacy which, if his testimony be true according to his manifest view of its effect, did not belong to him morally or legally. On the contrary, Mr. Justice Blanchard wrote of those two witnesses:

"No evidence * * * indicating bias [on their part] was produced."

And again, as to Dr. Hoyt:

"Yet he had put in peril an assured sum [viz., the legacy] in exchange for an indefinite promise."

In the case here at bar the promise has ceased to be indefinite, and has become so precise as to be accompanied by the deposit with a stakeholder of the actual sum of money represented by the imperiled legacy.

Moreover, the plaintiffs in that action were blood relatives of James P. Wallace, and therefore may be said to have had an equity superior to the plaintiffs here, who are blood relatives, not of him, but of Mrs. Wallace. Whether that learned jurist would have decided the same, if the evidence before him had been as it is now before this court here, can, at the most, be only a matter of speculation, into which it is not necessary to enter. I am clearly convinced that the evidence here before the court is not sufficient to establish the plaintiffs' case. Therefore the decision must be in favor of the defendants, but without costs.

The compromise made of the other action served, doubtless, as an invitation to the bringing of this action, and hence I think the plaintiffs here should not be charged with an extra allowance or the costs.