---

Lᴏᴜʟᴀ Mᴀᴇ MᴄLᴇᴀɴ, Plaintiff, *v.* Jᴏʜɴ C. Cʟᴀʀᴋ and Fᴀʀᴍᴇʀs' Lᴏᴀɴ ᴀɴᴅ Tʀᴜsᴛ Cᴏᴍᴘᴀɴʏ, as Executors of and Trustees under the Last Will and Testament of Sᴛᴇᴘʜᴇɴ A. MᴄLᴇᴀɴ, Deceased, and Others, Defendants.

Supreme Court, Westchester Special Term, March, 1922.

Contracts — decedent's estate — evidence insufficient to justify finding of agreement to make mutual wills — when alleged agreement inequitable — estoppel — when written agreement to make no claim against estate bars action on alleged contract to make mutual wills.

In order to establish mutual wills it must appear that they were executed in pursuance of an agreement certain and definite in its terms.

In an action to enforce an agreement alleged to have been made between plaintiff and her husband just after their marriage, for the making of mutual wills under which the survivor was to take the entire estate of the other, the plaintiff claimed that in performance of said agreement she and her husband made separate wills in each other's favor. Upon the trial the husband's will was put in evidence, and the contents of plaintiff's will, which was not produced, were proved by a carbon copy produced by the lawyer who drew both wills. It also appeared that the husband made later wills drawn by the same lawyer, who was the intermediary in the marital differences between plaintiff and her husband and to whom the husband never made mention of a mutual will agreement. Though under the last will plaintiff was given property of the value of $245,000 the residuary estate, amounting to $165,000, was given to the testator's sisters. The words " mutual wills " did not appear in any of the correspondence between the testator and the lawyer, nor in the separate wills were there to be found expressions that would justify a conclusion that plaintiff and her husband

intended that each should be irrevocably bound by the wills then executed. *Held*, upon consideration of all the evidence, that it was too unreliable and doubtful in character to justify a finding in plaintiff's favor and that the defendants were entitled to judgment for a dismissal of the complaint upon the merits.

A writing executed by all parties in interest, including plaintiff, by which she, in consideration of a cash payment to her by testator's sisters from their shares in the estate, agreed to interpose no objections to the probate of the last will of decedent and to make no claim whatever for any interest in any property of the estate except such as she was entitled to under said will, estopped her from making her present claim.

The great bulk of the estate of which the husband died seized and possessed having been acquired two years after the alleged mutual wills were made, by inheritance from his father, who left him a large amount of property which in value was about the same as the estate left by plaintiff's husband, the alleged agreement could not be regarded as equitable.

ACTION to enforce agreement to make mutual wills.

*Clark, Close & Davis*, for plaintiff.

*Olin, Clark & Phelps*, for defendants.

TOMPKINS, J.   The plaintiff is the widow of Stephen A. McLean who died in Westchester county, N. Y., on the 2d day of February, 1920, and whose last will and testament was probated in the Westchester county Surrogate's Court on February 27, 1920. The testator left an estate of approximately $600,000, and by his said last will and testament gave $5,000 to each of four sisters and a brother of the plaintiff.   To his widow, the plaintiff herein, he gave their residence at Mt. Kisco, the equity in which was of the value of about $100,000, together with the furniture and furnishings therein worth $7,675, and besides gave to said widow the income of a trust fund of $200,000.

The full market value at the date of the testator's death of the property passing to the plaintiff under said will was about $245,000, and to his two sisters the testator gave the residue of his estate, of the value of about $165,000.

This action is brought by the widow, to enforce an agreement alleged to have been made in the year 1906, just subsequent to their marriage, between herself and her husband, for the making of mutual wills under which the survivor was to secure the entire estate of the other, and which agreement it is claimed by the plaintiff was consummated on March 10, 1909, when the plaintiff and her husband made and executed separate wills whereby each left to the other his or her entire estate.   The original will executed by the husband on that date was found after his death in the Hanover Safe Deposit vault and is in evidence in this case.   The plaintiff's will of the same date was not produced at the trial but its contents were proved from a carbon copy produced by the lawyer who prepared and superintended the execution of said wills.   Thereafter

the testator made four other wills and one codicil, the wills being dated April 1, 1911, April 3, 1911, May 1, 1913, and May 1, 1918. The codicil was dated April 7, 1913.

After careful consideration of the evidence, documentary and oral, and the very thorough briefs of counsel, and the circumstances and probabilities of the case, I have reached the conclusion that the plaintiff has failed to establish the alleged agreement between her husband and herself for the making of mutual wills by that clear and convincing proof that is required in a case of this character. There is no documentary proof of the alleged agreement, save the separate wills of the parties that were executed on March 10, 1909, and the correspondence between the testator and Mr. Salmon who prepared and attended to the execution of said wills. Nowhere in these documents is there any declaration of an agreement for mutual wills and I cannot find in them any language that justifies such an inference. It is not enough to support an action of this character that the execution of mutual wills be established. It must further appear that they were executed in pursuance of an agreement between the parties made in certain and definite terms. *Wallace* v. *Wallace*, 158 App. Div. 273, and cases there cited; *Edson* v. *Parsons*, 155 N. Y. 555.

The words " mutual wills " do not appear in any of the correspondence or in the wills themselves.

I cannot find in these documents expressions that justify a conclusion that the husband and wife intended that each should be " irrevocably " bound by the wills then executed. *Edson* v. *Parsons, supra.*

The only other evidence in support of the plaintiff's claim is the testimony of her brother Benjamin Ketcham and one George W. Will. Ketcham's testimony related to a time just prior to the execution of the wills in March, 1909, and he testified that McLean stated in his presence that he and his wife were about to make mutual wills and asked Ketcham if he knew what they were and then said, " that if he should die everything goes to Mrs. McLean,— Loula; if she should die everything goes to me," and that a few days later when the will was executed, and in the presence of the lawyer and the subscribing witnesses that McLean again said: " ' Ben, do you know what this means.' I said ' Yes, I do.' He said ' This means that Bonnie gets everything if I die and if Bonnie dies I get everything, and it comes back to me,' and he said: ' do you understand ' and I said: ' I understand completely ' and then the testator further said: ' these wills cannot be changed without Mrs. McLean's and my consent.' "

It seems to me rather strange that the testator should have

made these explicit declarations to Ketcham at the time of the execution of the wills and in the presence of the witnesses and lawyer, especially in view of the fact that if his testimony is true, only a day or two before the testator had made similar statements to Ketcham. More than twelve years elapsed between the time when these conversations are alleged to have occurred and the trial of this action, and that fact in connection with the interest of Ketcham as a brother of the plaintiff, who with his four sisters, her nearest relatives, would upon her death without a will in the event of the plaintiff's success in this action inherit an estate of about $600,000, requires that his testimony be considered with great caution, and it seems to me to be insufficient to establish such an important and far-reaching contract as the plaintiff seeks to establish.

The witness George W. Will is an insurance broker, and placed the fire insurance on the Mt. Kisco and Mountainville properties, all of which now belong to the plaintiff. He testified that in July, 1919, while he and McLean were walking through the house and about the premises at Mt. Kisco and talking about insurance matters and while McLean was apologizing for the actions of Mrs. McLean, and saying that they had had some differences which were unfortunate, McLean abruptly stated: " There is no reason for it, we have made our mutual wills, and there is no reason why she feels that way."

This seems to me very unreasonable, especially in view of the fact that prior to the date of this alleged conversation McLean had made the four new wills already referred to, including the last will and testament of May 1, 1918.

I have here reviewed the substance of all the evidence, documentary and parol, by which the plaintiff seeks to establish the alleged agreement, and conclude that it is too unreliable and doubtful in character to justify a finding in the plaintiff's favor. There are other facts and circumstances, however, that negative the proposition that the plaintiff and McLean since 1909 understood that the wills executed by them in that year were irrevocable, and these I shall consider briefly.

(1) The execution of four subsequent wills and one codicil by the testator, all drawn by Judge Clark, who acted as his attorney from 1911 and who was the intermediary between Mr. and Mrs. McLean in their marital differences, and to whom the testator never made any mention of a mutual will agreement.

(2) Louisa Bloom, a housekeeper in the plaintiff's home at Mt. Kisco, testified that on two occasions in April and July of 1919, which was the year before McLean's death, the plaintiff told her

that her husband had made a will in favor of his sisters and that if she executed a deed of the Mt. Kisco property as he wished her to do, she " would have nothing practically, and be a beggar." This witness seemed to be disinterested and impressed me as truthful.

(3) On August 27, 1919, in a talk with Judge Clark, a man of high standing in his profession, and the lawyer who had drawn her husband's four subsequent wills, the plaintiff said, " Stephen has told me that he has made a new will under which his sisters will get a substantial part of his property and I don't want to let this house go because I want to keep my dower interest in it," to which Judge Clark replied: " that is true, Stephen has made a new will," and in the same conversation plaintiff said in substance that she wanted to know what she was going to get when her husband should die and further stated in substance that because of her fear that her husband was not providing for her by will, she had not been willing to release her dower in the Mt. Kisco property when he wished to sell it.

(4) On February 7th, 10th, 20th, 25th, 26th and 27th of the year 1920, and after her husband's death and before the probate of his will. plaintiff had conversations with Judge Clark, in which she expressed her dissatisfaction with the provisions of the will, not because it was contrary to any mutual agreement, but principally because she had not been given the Mt. Kisco property free and clear of incumbrances and because the Mountainville premises had not been left to her, and in none of these conversations did she make any claim with respect to a mutual will agreement.

In one of these conversations with Judge Clark, her sister, who was present and who was one of the witnesses to the 1909 so-called mutual wills, said to plaintiff, " Well Loula, isn't that more than you expected to get," and the plaintiff replied, " Yes I suppose it is but I don't think that I ought to be obliged to pay that $50,000 mortgage." This testimony of Judge Clark was not contradicted by the plaintiff's sister.

As a result of the plaintiff's dissatisfaction with the provisions of the will, and the several conferences during the month of February, 1920, the testator's sisters, to whom the Mountainville properties had been devised, agreed to convey all of their interest in the said premises to the plaintiff, together with shares in a grocery company, all of which, including the Mountainville property, it was agreed were of the approximate value of $20,000, and the testator's sisters at the same time agreed to pay the plaintiff the sum of $5,000 in cash from their shares of the testator's estate, and in consideration thereof the plaintiff agreed to interpose no objection to the probate of the said last will and testament, and

to make no further claim for any interest by way of dower or otherwise in any property of the estate except such as she was entitled to under said will, and this agreement was reduced to writing on February 27, 1920, and executed by all the parties, including the plaintiff, and thereupon on the said 27th day of February, 1920, the last will and testament executed May 1, 1918, was probated.

By that settlement agreement the plaintiff is estopped from making her present claim.

Thereafter the estate was administered by the executors under the said last will and testament and various payments were made to the plaintiff by the executors and trustees on account of the income from the $200,000 trust fund, and the $5,000 legacies, to each of the plaintiff's sisters and brother, were paid, and it was not until after the executors had established the trust fund of $200,000 for the plaintiff's benefit and filed their final account in the Surrogate's Court that this action was commenced, and it was not until September, 1920, that any suggestion was made on behalf of the plaintiff that she would not carry out the terms of the settlement agreement made at the time of the probate of the will. At that time Mr. Witschief, who was then her attorney, wrote to the attorney for the executors, " Mrs. McLean has not yet arrived at a decision as to her course, but is considering it and in the meantime it will not be necessary for you to make payment of the $5,000 which was referred to in your letter of February 26th, 1920, and of the deed of the property on the west side of the Hudson river."

The words of this communication from plaintiff's attorney, " letter of February 26th, 1920," referred to the settlement agreement made with the testator's sisters on the day the will was probated, or the day before, and the words " deed of the property on the west side of the Hudson river " referred to the Mountainville properties.

(5) It is the law that such a contract as the plaintiff seeks to establish should seem to be equitable. *Hamlin* v. *Stevens*, 177 N. Y. 39, 48.

The alleged agreement here cannot be regarded as equitable because the great bulk of the testator's estate of which he died seized and possessed was acquired by him in 1911, two years after the alleged mutual wills were made, by inheritance from his father. The undisputed testimony is that the testator's father left him nearly $600,000 and that was about the value of the estate left by the testator, so that at the time of the execution of the alleged

mutual wills the testator was possessed of a comparatively small estate, while the plaintiff at that time owned a " cottage," the value of which does not appear, and a mortgage, the amount of which was not shown, but from her statement to Mrs. Bloom in 1919, that if she released her dower rights in the Mt. Kisco property she practically would be a " beggar " makes reasonable the inference that she owned but little property at the time of the execution of the wills in 1909, or at any time thereafter prior to her husband's death.

I have not overlooked the fact that the plaintiff denies some of the testimony given by Judge Clark with respect to their conversations in February, 1920, but in these respects she was not corroborated by her sister, Mrs. Clark, or her lawyer, Mr. Merriam, each of whom was present on two separate occasions, and plaintiff admitted talking with the housekeeper, Mrs. Bloom, and did not deny her testimony further than to say that she " Did not recall it; " and with respect to the testimony of Judge Clark, regarding the conversation of August 27, 1919, the plaintiff when recalled as a witness testified: " Judge Clark,— I went to his office one day and speaking of some of the usual conditions he said something about a will."

For the reasons here stated I decide that the plaintiff has failed to make out the cause of action alleged in the complaint, and that the defendants are entitled to judgment upon the merits dismissing the complaint, with costs.

Judgment accordingly.